UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LISA ANN SMITH, | CASE NO. 5:12CV846 |
| Plaintiff, | MAGISTRATE JUDGE |
| v. | GEORGE J. LIMBERT |
| CAROLYN COLVIN[1], | |
| COMMISSIONER OF | **MEMORANDUM OPINION & ORDER** |
| SOCIAL SECURITY, | |
| Defendant. | |

Lisa Ann Smith ("Plaintiff") seeks judicial review of the final decision of Carolyn Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1.  For the following reasons, the Court AFFIRMS the Commissioner's decision and dismisses Plaintiff's complaint in its entirety with prejudice.

**I.     PROCEDURAL AND FACTUAL HISTORY**

On May 20, 2009, Plaintiff filed applications for DIB and SSI, alleging disability beginning January 15, 2008 due to bad knees, bad shoulders, lower back problems, panic disorder, stomach and colon problems and lung problems.  ECF Dkt. #11 at 126-136, 180.  The SSA denied Plaintiff's applications initially and on reconsideration.  *Id*. at 76-107.  Plaintiff filed a request for an administrative hearing and on March 1, 2011, an ALJ conducted an administrative hearing.  *Id*. at 33, 107.  At the hearing, the ALJ heard testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE").  *Id*. at 33.

On June 10, 2011, the ALJ issued a decision denying benefits.  ECF Dkt. #11 at 16-26.  Plaintiff filed a request for review of the decision, but the Appeals Council denied the request.  *Id*. at 4-12, 246-247.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

On April 9, 2012, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On September 18, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #16. On November 2, 2012, Defendant filed a brief on the merits. ECF Dkt. #17. On November 29, 2012, Plaintiff filed a reply brief. ECF Dkt. #20.

**II**.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

In her decision, the ALJ determined that Plaintiff suffered from: irritable bowel syndrome ("IBS"); status post cholecystectomy; asthma; right rotator cuff tendinitis and subacromial bursitis; degenerative disc disease ("DDD") of the cervical spine; DDD of L5-S1; patellofemoral arthritis of the knee; depressive disorder not otherwise specified ("NOS"); anxiety disorder; panic disorder with agoraphobia; and polysubstance dependence in remission with a relapse in February of 2009. ECF Dkt. #11 at 18. The ALJ found that these impairments qualified as severe impairments under 20 C.F.R. § 404.1521 and § 416.920, *et seq*. *Id*. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *Id*. at 19. She discounted Plaintiff's allegations of pain and concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: a sit/stand option; no concentrated exposure to fumes, odors, gases and poorly ventilated areas; low-stress tasks with no strict time requirements, no high production quotas such as piece work or assembly line work; no arbitration, negotiation or confrontation; no directing the work of others; and she cannot be responsible for the safety of others. *Id*. at 20.

Based upon this RFC and the testimony of the VE, the ALJ found that Plaintiff could not return to her past relevant work, but she could perform jobs existing in significant numbers in the national economy, including the representative occupations of a cashier II, ticker seller, bench assembler and parking lot attendant. ECF Dkt. #11 at 25.

**III.**    **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI. These steps are:

1.     An individual who is working and engaging in substantial gainful activity

>    will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));
>
> 2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));
>
> 3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));
>
> 4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));
>
> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011), quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where

the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.     ANALYSIS

Plaintiff's sole assertion of error is that the ALJ erred in evaluating the opinions of her treating physicians, Dr. Eley and Dr. Tsivitse. ECF Dkt. #16 at 13-16. The Court finds that while the ALJ failed to adequately apply the treating physician rule to Dr. Eley's opinions, this constitutes harmless error. Moreover, the Court finds that Dr. Tsivitse was not a treating physician and therefore the ALJ was not required to apply the treating physician rule to his opinions.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. An ALJ must give controlling weight to the opinion of a treating physician if the ALJ finds that the opinion on the nature and severity of an impairment is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). If an ALJ does not give controlling weight to the opinions of a treating physician, the ALJ must apply the factors in 20 C.F.R. § 404.527(d)(2)(i), (d)(2)(ii), (d)(3) through (d)(6) [20 C.F.R. §416.927(d)(2)(i), (d)(2)(ii), (d)(3) through (d)(6) for SSI] which include the length of the treatment relationship, the frequency of the examinations, the nature and extent of the treatment relationship, the supportability of the opinions with medical signs, laboratory findings, and detailed explanations, consistency of the opinions with the record as a whole, the specialty of the treating physician, and other factors such as the physician's understanding of social security disability programs, and familiarity of the physician with other information in the claimant's case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004), quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007), citing *Wilson*, 378 F.3d at 544.

However, the Sixth Circuit recognized in *Wilson* that, in some circumstances, a violation of the rule might be "harmless error" if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation." 378 F.3d at 547. "Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.*" Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010), unpublished.

### A. <u>TREATING PRIMARY CARE PHYSICIAN DR. ELEY</u>

The first medical note in the record shows that Dr. Eley was Plaintiff's treating primary care physician at least as far back as February 21, 2003, well before her alleged disability onset date. ECF Dkt. #11 at 345. Dr. Eley's records relevant to Plaintiff's alleged disability onset date show that on January 8, 2008, he examined her on follow-up of her medications and they discussed her upper respiratory infection symptoms, recurrent nausea, low back pain and panic disorder symptoms. *Id.* at 359. He found that her low back pain was likely mechanical and noted that he recommended

physical therapy, but she could not participate because she had no health insurance. *Id.* He also noted her anxiety disorder/panic disorder and medication usage, but she refused a referral to psychiatry for further evaluation. *Id.* Dr. Eley also noted her abdominal pain/IBS and his recommendations for a colonoscopy and endoscopy, but indicated her inability to afford them. *Id.* On April 22, 2008, Plaintiff complained of becoming sick after she ate and having diarrhea since January or February. *Id.* at 482. Upon physical examination, Dr. Eley found normal results except for tenderness on palpation of the right upper quadrant with a positive Murphy's sign. *Id.* at 488. Dr. Eley suspected a gallbladder problem and he referred her to a gastroenterologist. *Id.*

On July 9, 2008, Dr. Eley examined Plaintiff for her complaints of increased anxiety symptoms and insomnia. ECF Dkt. #11 at 361. Plaintiff noted that since her gallbladder surgery, she had no significant problems except for a decreased appetite. *Id.* His physical examination of her was normal and she reported that she was seeing a counselor at Portage Path Behavioral Center. *Id.* at 362. Dr. Eley diagnosed anxiety disorder and insomnia. *Id.*

On August 8, 2008, Plaintiff presented for follow-up with Dr. Eley and indicated that while she felt better after the gallbladder surgery, she was continuing to have significant low back pain. ECF Dkt. #11 at 363. Dr. Eley found a normal physical examination and diagnosed panic disorder, low back pain and chronic sinusitis. *Id.* at 364. On September 15, 2008, Plaintiff presented to Dr. Eley complaining of breathlessness, chest tightness and a more productive cough. *Id.* at 365. Dr. Eley questioned if Plaintiff had asthma versus a developing Chronic Obstructive Pulmonary Disease ("COPD"). *Id.* at 366. He gave Plaintiff samples of medication. *Id.* He noted that his physical examination revealed normal results and he indicated that Plaintiff continued to smoke cigarettes. *Id.* He also diagnosed insomnia and anxiety disorder. *Id.* Plaintiff followed up with Dr. Eley on September 23, 2008 regarding her chest tightness and congestion, reporting that the sample medications that he gave her helped. *Id.* at 368. He encouraged her to get a pulmonary function test but she was reluctant to do so because of the cost. *Id.* He found normal physical examination results and assessed that she had a hyperreactive airway disease and chronic sinusitis. *Id.*

Plaintiff underwent a pulmonary function test on October 1, 2008. ECF Dkt. #11 at 272. The testing indicated an absence of reversible bronchospastic component, normal spirometry, and

-6-

y

normal maximal voluntary ventilation. *Id.* A decreased DLCO was also shown with mild hyperinflation. *Id.* Impressions from the testing included a normal pulmonary function study except for decreased DLCO which could have been from smoking or from pulmonary fibrosis of interstitial edema. *Id.* Clinical correlation was recommended. *Id.* On October 31, 2008, Plaintiff presented to Dr. Eley to discuss her anxiety symptoms. *Id.* at 370. She indicated that her gynecologist believed that she was perimenopausal, but would not give her estrogen replacement therapy because she smoked. *Id.* Dr. Eley's physical examination of Plaintiff was normal and he assessed that perhaps Plaintiff's anxiety was exacerbated by perimenopause. *Id.* He encouraged her to quit smoking. *Id.*

On January 9, 2009, Plaintiff presented to Dr. Eley complaining of tightness in her chest, shortness of breath and congestion. ECF Dkt. #11 at 494. It was noted that she still smoked on a daily basis. *Id.* Physical examination indicated that Plaintiff had slight streaky erythema of the pharynx and purulent appearing postnasal drainage and rhinorrhea. *Id.* at 495. Dr. Eley assessed an exacerbation of asthma perhaps secondary to acute sinusitis, gave her sample medications and a steroid, and encouraged her to stop smoking. *Id.* Dr. Eley ordered chest x-rays on January 12, 2009 due to Plaintiff's complaints of chest pain and coughing. *Id.* at 330. The x-rays showed no acute cardiopulmonary disease. *Id.*

A March 5, 2009 note from Dr. Eley indicated that Plaintiff presented complaining of chest tightness and heaviness, pain when she breathed deeply, and exhaustion. ECF Dkt. #11 at 496. She continued to smoke. *Id.* She also complained of poorly treated anxiety symptoms. *Id.* Physical examination revealed normal results except for occasional scattered wheezes and Dr. Eley assessed shortness of breath of an uncertain etiology, and maybe mild exacerbation of asthma. *Id.* He prescribed prednisone and referred her to a pulmonologist. *Id.* at 497. On March 26, 2009, Plaintiff presented to Dr. Eley complaining of a possible sinus infection with pressure, congestion and a headache over the last two weeks. *Id.* at 498. It was again noted that Plaintiff continued to smoke. *Id.* Dr. Eley examined Plaintiff and noted a streaky erthyema of the posterior pharnyx and mild bilateral cervical lymphadenopathy with a supple cervical spine. *Id.* He prescribed an antibiotic. *Id.* Dr. Eley again noted that while Plaintiff continued to seek refills of Klonopin by telling him that

-7-

her psychiatrist said it was an appropriate medication for severe anxiety symptoms, she nevertheless asked him for the medication and not her psychiatrist. *Id*. Dr. Eley indicated that Plaintiff also again denied to him the inappropriate use of the drug or that she was selling it or obtaining it from another provider, and he gave her a small amount with no refills. *Id.*

Plaintiff presented to Dr. Eley on April 23, 2009, complaining of cough and congestion that were not going away. ECF Dkt. #11 at 500. He noted that she had a pulmonary evaluation scheduled, but continued to smoke. *Id*. at 501. Upon examination, he noted a streaky erythema in the poster pharnyx and he assessed acute bronchitis with exacerbation of asthma. *Id*. He prescribed an antibiotic, told her to continue to take her inhalers and to follow up with her pulmonology valuation. *Id*.

On June 26, 2009, Plaintiff presented to Dr. Eley complaining of her feet being swollen. ECF Dkt. #11 at 502. She otherwise reported feeling well. *Id*. at 503. Physical examination yielded normal results except for pitting bilateral pedal edema. *Id*. Dr. Eley assessed bilateral pedal edema of an uncertain etiology and noted that her blood pressure was a little higher than usual. *Id.* He gave her medication. *Id*. An August 4, 2009 treatment note indicated that Plaintiff complained of not feeling right, having a fever on and off, and feeling very exhausted. *Id*. at 508.

On October 26, 2009, Plaintiff presented to Dr. Eley complaining of a possible sinus infection with congestion, and feeling tired. ECF Dkt. #11 at 551-552. Plaintiff reported that she was trying to quit smoking and she was smoking only 4 to 5 cigarettes per day. *Id*. at 552. Physical examination revealed streaky erythema of the posterior pharnyx and Dr. Eley assessed acute sinusitis and prescribed an antibiotic. *Id*.

On December 30, 2009, Plaintiff presented to Dr. Eley complaining of pressure in her chest with sharp pain over the last ten days and sinus drainage. ECF Dkt. #11 at 685. She indicated that she was smoking only intermittently and was doing better with her asthma medications. *Id*. She reported that her symptoms were not associated with exertion and were not relieved by rest. *Id*. She stated that she was going to quit smoking on New Year's Day. *Id.* Dr. Eley noted a normal physical examination with normal movement of all extremities and a normal gait, but he did find tenderness on palpation around the costonchondral junctions about the sternum bilaterally which seemed to

-8-

reproduce her symptoms. *Id*. He assessed atypical chest pain that did not suggest a cardiac etiology but may be due to coughing from sinus drainage. *Id.* He prescribed a steroid. *Id.* On January 5, 2010, Plaintiff called Dr. Eley's office and reported that she still had sinus drainage and her chest was still feeling a little tight. *Id.* at 685. He prescribed an antibiotic. *Id*

On June 10, 2010, Plaintiff presented to Dr. Eley complaining of pain in her left arm and shoulder after mowing the grass and breaking up branches in the yard over the weekend. ECF Dkt. #11 at 683-684. She reported similar symptoms in the past with unusual activity. *Id*. at 684. She scheduled an appointment with an orthopedic clinic and had gotten a cortisone injection. *Id.* Dr. Eley examined Plaintiff and found her in mild distress with tenderness over the anterior aspect of her left rotator cuff. *Id*. He noted that she continued to smoke and assessed her as having left shoulder pain and considered rotator cuff pathology. *Id.* He injected a cortisone shot into her right shoulder at her request. *Id.*

On August 24, 2010, Plaintiff presented to Dr. Eley complaining of neck and shoulder pain after weeding her yard. ECF Dkt. #11 at 694. She also complained of reflux-like symptoms after weeding the yard, a red rash on her right wrist, and vomiting over the prior three nights. *Id*. She continued to smoke. *Id*. Dr. Eley found a normal physical examination except for the rash on Plaintiff's right wrist. *Id.* He assessed that Plaintiff had vomiting with exacerbation of acid reflux or gastroesophageal reflux disease ("GERD") and he gave her samples of Nexium. *Id.* He also assessed the rash as contact dermatitis and prescribed a cream for it. *Id*.

On February 24, 2011, Dr. Eley completed a Pain Questionnaire form concerning Plaintiff. ECF Dkt. #11 at 725. He listed Plaintiff's impairments as low back pain, knee pain due to osteoarthritis, shoulder pain due to cervical radicular symptoms or DDD, anxiety disorder, and IBS. *Id*. He summarized Plaintiff's subjective complaints as knee pain, low back pain, shoulder and neck pain, abdominal pain and anxiety. *Id.* He reported that he believed that Plaintiff's complaints were reasonably derived from underlying impairments that his objective and clinical findings established in that lumbar and cervical spine x-rays showed that she had DDD. *Id*. He also opined that the intensity and persistence of the pain that Plaintiff experienced impacted her ability to perform work-related activities in that she would have difficulty and increased pain with prolonged standing,

-9-

sitting and she needed to change positions frequently. *Id*. He further opined that the medications that she used to control her symptoms could impact her alertness or cause safety issues. *Id*. He indicated that Plaintiff's pain would be severe enough to interfere frequently with her abilities to concentrate and pay attention. *Id*.

In her decision, the ALJ acknowledged Dr. Eley's pain questionnaire responses. ECF Dkt. #11 at 24. She indicated that she gave his opinion "moderate weight" because of his long-term relationship with Plaintiff and she indicated that she had incorporated a sit/stand option into her RFC for Plaintiff. *Id*. at 20, 24.

As Plaintiff points out, the ALJ did not conduct a treating physician analysis when she failed to attribute controlling weight to Dr. Eley's opinion. However, as indicated above, the Sixth Circuit in *Wilson* considered three possible scenarios that could lead the Court to a finding of harmless error when an ALJ violates the treating physician rule. 378 F.3d at 547. First, the Court indicated that harmless error might occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it...." *Id.* The Court found the second scenario of harmless error to exist when the ALJ's decision was consistent with the treating physician's opinion. *Id*. The *Wilson* Court's third scenario considered the possibility "where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation." *Id.*

In the instant case, the Court finds that while the ALJ should have more thoroughly assessed Dr. Eley's opinion and notes and in the application of the treating physician rule, the ALJ's failure to do so constitutes harmless error akin to the *Wilson* Court's second harmless error scenario. While indicating that she attributed only "moderate weight" to Dr. Eley's opinion, the ALJ nevertheless incorporated each of the limitations posited by Dr. Eley for Plaintiff in the pain questionnaire. Dr. Eley opined that Plaintiff would have difficulty and increased pain with prolonged standing and sitting and needed to frequently change positions and the ALJ incorporated a light work RFC with a sit/stand option. ECF Dkt. #11 at 20, 24, 725. Dr. Eley further opined that Plaintiff's attention and concentration would frequently be affected by her impairments and the ALJ accommodated this limitation by restricting Plaintiff to work that was low-stress, with no time requirements, no high

-10-

production quotas, no arbitration, negotiation or confrontation. *Id*. And Dr. Eley indicated that Plaintiff's medications may cause symptoms that affect her alertness and safety, so the ALJ limited Plaintiff to work in which she did not direct the work of others or was responsible for others. *Id*.

Accordingly, while the ALJ should have addressed the treating physician rule with regard to the responses of Dr. Eley to the pain questionnaire, the Court finds that her failure to do so constitutes harmless error.

### B. DR. TSIVITSE- PULMONOLOGIST

Plaintiff also asserts that the ALJ erred in failing to apply the treating physician rule to the opinions of Dr. Tsivitse, her pulmonologist. Dr. Tsivitse began treating Plaintiff for pulmonary issues on March 31, 2009 upon referral from Dr. Eley. ECF Dkt. #11 at 438. Plaintiff complained of tightness, heaviness and pain in her chest and back, and shortness of breath and pain when she took deep breaths. *Id*. She indicated that she smoked one pack of cigarettes per day and had tried to quit smoking. *Id*. at 441. She further related that she became short of breath with walking and exertion, and in low humidity and in cold air. *Id*. at 440. Dr. Tsivitse's impression was that Plaintiff had asthma. *Id*. at 443.

Dr. Tsivitse wrote an order dated May 6, 2009 for Plaintiff to undergo the bronchoprovocation methocholine challenge. ECF Dkt. #11 at 442. He listed Plaintiff's diagnosis as asthma. The bottom of this form showed that the testing was scheduled for May 29, 2009. *Id.*

On May 6, 2009, Dr. Tsivitse also wrote a letter to Dr. Eley thanking him for his referral and indicating that Plaintiff was a lifetime smoker with anxiety problems who wanted to quit smoking. ECF Dkt. #11 at 445. He informed Dr. Eley that upon examination and pulmonary testing, Plaintiff had reduced diffusion capacity which was likely from smoking and he heard a slight wheeze on expiration, although Plaintiff's chest x-ray showed no abnormalities. *Id.* He noted the possibility that Plaintiff could have interstitial lung disease, but he thought that her reduced diffusion capacity on the test was most likely because she had smoked just prior to the testing. *Id*. Dr. Tsivitse indicated that Plaintiff was on a long-acting bronchodilator, taking a steroid and was on medication, all of which she should remain taking. *Id*. He raised the possibility that Plaintiff had asthma with possible allergies and indicated that he had ordered a methacholine provocation test. *Id*. He

-11-

informed Dr. Eley that he had provided Plaintiff with nicotine patch samples and a phone number for group therapy to aid her in smoking cessation. *Id.*

The record contains no additional notes from Dr. Tsivitse confirming that Plaintiff underwent the testing or that she treated with Dr. Tsivitse again.

Nevertheless, on December 9, 2009, Dr. Tsivitse completed a form entitled "Medical Statement Regarding COPD (Chronic Obstructive Pulmonary Disease) Where Smoking is Issue." ECF Dkt. #11 at 577. Dr. Tsivitse checked boxes indicating that Plaintiff had dyspnea on exertion, a chronic cough, wheezing, and asthma. *Id*. He also checked the box indicating that Plaintiff had restrictive lung disease. *Id*. However, next to this, where the form indicated that he should indicate the cause or causes, Dr. Tsivitse handwrote something but then scratched it out without adding any other cause of causes. *Id*. He checked yes when asked if Plaintiff had a significant smoking history and checked yes in answer to whether Plaintiff could reduce her current disability and future disability if she stopped smoking. *Id*. However, he checked the "no" box when asked if Plaintiff was still smoking. *Id*. He noted that supplemental oxygen was not prescribed for Plaintiff. *Id*.

Part A of the medical statement form asked Dr. Tsivitse to opine Plaintiff's limitations if she continued to smoke at her current level. ECF Dkt. #11 at 577. Dr. Tsivitse opined that Plaintiff could work one hour per day, standing for fifteen minutes per eight-hour workday, sitting and walking for thirty minutes each per eight-hour workday, lifting up to five pounds on an occasional basis and lifting no weight on a frequent basis. *Id*. He further opined that Plaintiff could not tolerate dust, smoke or fumes. *Id*. Part B of the form asked Dr. Tsivitse to opine Plaintiff's functional ability to perform the same activities identified in Part A if she stopped smoking. *Id*. at 578. Dr. Tsivitse checked the boxes indicating that Plaintiff could work one hour per day if she stopped smoking, standing thirty minutes in an eight-hour day, sitting and walking fifteen minutes per eight-hour day, and lifting five pounds occasionally and no weight frequently. *Id*. He again indicated that Plaintiff could not tolerate dust, smoke or fumes. *Id.* He stated that Plaintiff's limitations had existed since January 15, 2008 and continued to the present. *Id*. In the comments section of the form, Dr. Tsivitse made a barely legible handwritten comment that appears to state that Plaintiff does not meet the established guidelines for impairment. *Id.*

On December 15, 2009, Dr. Tsivitse completed a form entitled "Medical Assessment of Ability to Do Work-Related Activities (Physical)." ECF Dkt. #11 at 579. On this form, he opined that Plaintiff's impairment impacted her lifting and carrying abilities and she could lift and/or carry up to five pounds occasionally. *Id.* He further opined that Plaintiff could stand and/or walk up to a total of thirty minutes per eight-hour workday, her impairment did not affect her ability to sit, she could only occasionally perform postural activities, and her physical functions of reaching, handling, feeling, pushing and pulling were affected by her impairment. ECF Dkt. #11 at 580. He also opined that Plaintiff's impairment affected her abilities to be exposed to heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity. *Id.* He concluded that Plaintiff's impairment or treatment for the impairment would cause her to be absent from work more than three times per month. *Id.*

In her opinion, the ALJ only addressed Dr. Tsivitse's December 9, 2009 statement and found the following:

> Dr. Tsivitse's statement dated December 9, 2009 severely limits her to standing 30 minutes in an eight-hour day, walking 15 minutes in an eight-hour day, sitting less than 30 minutes in an eight-hour day, and only lifting five pounds on an occasional basis and none on a frequent basis (25F). This opinion is not given weight as it is not consistent with the medical evidence of record, particularly the pulmonary function study (3F/19), normal chest x-rays (5F/8) and the fact that the claimant continues to smoke as well as examinations which show adequate strength and stable gait.

ECF Dkt. #11 at 24.

Plaintiff asserts that the ALJ failed to follow the treating physician rule with regard to Dr. Tsivitse's December 9, 2009 opinion and failed to even mention Dr. Tsivitse's December 15, 2009 opinion which opined that Plaintiff would be absent from work three or more times per month due to her impairment. ECF Dkt. #17 at 11.

It appears that the ALJ did not find Dr. Tsivitse to be a treating physician as she did not identify him as one when discussing his opinion and she specifically identified Dr. Eley as a treating physician when discussing his opinion. *Compare* ECF Dkt. #11 at 23 ("Dr. Tsivitse's medical statement dated December 9, 2009...") with ECF Dkt. #11 at 24 ("Treating physician, Dr. James A. Eley, M.D indicated that..."). Defendant asserts that Dr. Tsivitse was not a treating physician and therefore the ALJ was not required to engage in a treating physician rule analysis with respect to Dr.

-13-

Tsivitse's December 9, 2009 or December 15, 2009 opinions.

The regulations define a treating physician as a physician who has provided medical treatment or evaluation and "who has, or has had, an ongoing treatment relationship with" the claimant. 20 C.F.R. § 404.1502. An ongoing treatment relationship exists when "the medical evidence establishes that [the claimant] see[s], or has seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.* A physician who has treated a patient only a few times may be considered a treating source if that frequency of visits is appropriate for the claimant's medical condition. *Id.*

Here, it appears that Dr. Tsivitse saw Plaintiff once on March 31, 2009 upon referral from Dr. Eley. ECF Dkt. #11 at 438. He may have also seen her on May 6, 2009 before he wrote a letter to Dr. Eley, but the letter that he wrote to Dr. Eley is unclear as to whether he had seen her on May 6, 2009 or whether he was just referring to the initial consultation. *Id.* at 445. And while his May 6, 2009 letter indicated that he was awaiting the results of a methacholine provocation test and would discuss its results at the next office visit, no further medical records confirm the existence of another office visit with him. The Sixth Circuit has found that a claimant's two office visits with a physician did not establish the existence of a treating physician relationship. *See Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485, 489–491 (6th Cir. 2005). Further, Plaintiff in this case continued to complain of chest pain, tightness and sought treatment for these symptoms with her primary care physician Dr. Eley, rather than return to Dr. Tsivitse. Given the nature of Plaintiff's ongoing complaints of symptoms, one or two visits does not suffice to render Dr. Tsivitse a treating physician.

In *Kornecky v. Commissioner of Social Security*, 167 Fed. App'x 496, 507-508 (6th Cir. 2006), the Sixth Circuit Court of Appeals applied the harmless-error rule when an ALJ failed to explain why he favored several examining physicians' opinions over the opinions of other examining physicians. The Sixth Circuit explained:

> The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will

> a person who has examined a claimant but once...." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994) ( "Dr. Ruff examined Mr. Barker on only one occasion, and the rationale of the treating physician doctrine simply does not apply here.").

167 Fed. App'x 496, 506 (6th Cir. 2006), unpublished. The *Kornecky* Court further noted that the claimant cited to no authority holding that a medical source is a treating physician after one visit and a plethora of decisions existed finding to the contrary. *Id.* The Court pointed out that "[i]ndeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship. *See, e.g., Cunningham v. Shalala*, 880 F.Supp. 537, 551 (N.D.Ill.1995) (where physician saw claimant five times in two years, it was "hardly a foregone conclusion" that his opinion should be afforded great weight)." *Id.* The claimant in *Kornecky* had argued that *Wilson* applied to a psychiatrist's evaluation and mental RFC assessment where that psychiatrist only saw him once and the ALJ failed to articulate his reasons for rejecting the psychiatric assessment and mental RFC. *Kornecky*, 167 Fed. App'x at 505. The Court concluded that *Wilson* did not apply because that holding applied to a treating physician's opinion and the ALJ in *Kornecky* did not ignore, misstate or fail to discuss a treating physician's opinion; "he merely failed to explain why he favored several examining physicians' opinions over another's." *Id.* at 507. The *Kornecky* Court acknowledged that while it would be ideal for an ALJ to articulate reasons for crediting or discrediting each medical opinion, it is well settled that:

> [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.

*Id.*, quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999) (citations and internal quotation marks omitted). The Court found that

> [n]o purpose would be served by remanding for the ALJ to explicitly address the shortcomings of [an examining physician's] opinion and the evidence and methods underlying it. *Cf. Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) (citation omitted) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.").

*Kornecky*, 167 Fed. Appx. 496, 507-508 (6th Cir.2006); *Bollenbacher v. Comm'r of Soc. Sec.*, 621 F.Supp.2d 497 (N.D.Ohio 2008) (finding that "[a]utomatic remand" was not warranted where ALJ

failed to explain reasons for apparently rejecting an examining physician's opinion and "the usual harmless error standard applies").

In the instant case, Dr. Tsivitse examined Plaintiff at most, according to the record, on two occasions. Accordingly, he was not a treating physician and therefore the ALJ did not commit reversible error in failing to apply the treating physician rule and in failing to address Dr. Tsivitse's December 15, 2009 assessment.

Moreover, it appears that the ALJ did review Dr. Tsivitse's December 15, 2009 assessment even though she did not indicate as much in her decision. At the hearing, the ALJ presented the VE with a hypothetical individual who, among other restrictions, would miss two or more days of work per month due to her impairments. ECF Dkt. #11 at 64. The restrictions presented in the December 15, 2009 assessment mirror those in the December 9, 2009 assessment except that in the latter, Dr. Tsivitse indicated that Plaintiff had no limits on her ability to sit during an eight-hour day and he opined that she would be absent from work more than three times per month. *Id.* at 577-580. Dr. Tsivitse also indicated in the December 15, 2009 assessment that Plaintiff had reaching, handling, feeling and pushing and pulling restrictions but he failed to identify them or the medical findings that supported them. *Id.* at 580.

The ALJ's explanation of her reasoning for attributing no weight to the December 9, 2009 assessment of Dr. Tsivitse could therefore apply to his December 15, 2009 assessment since they are similar. In rejecting Dr. Tsivitse's December 9, 2009 restrictive assessment, the ALJ found that it was not consistent with the medical evidence of record and she cited to Plaintiff's normal pulmonary function study in October of 2008, normal chest x-rays in 2009, the fact that Plaintiff continued to smoke, and the numerous examinations which showed that she had adequate strength and a stable gait. ECF Dkt. #11 at 24, citing ECF Dkt. #11 at 295, 330; *see also* ECF Dkt. #11 at 321, 362, 364, 366, 370, 467, 483, 485, 487, 489, 493, 497, 503, 507, 571, 660, 694, 737. In addition, Plaintiff's activities at home contradicted Dr. Tsivitse's severe restrictions in that, as indicated by the ALJ in her decision, Plaintiff presented to Dr. Eley in June 2010 after she was mowing the grass and breaking up branches in her yard, and she had been weeding her yard as well. ECF Dkt. #11 at 23, citing ECF Dkt. #11 at 684, 694.

Accordingly, the Court finds that the treating physician rule did not apply to Dr. Tsivitse's assessments and therefore the ALJ's failure to address his December 15, 2009 assessment was not erroneous.

## VI.  CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety WITH PREJUDICE.

DATE: August 20, 2013                              */s/George J. Limbert*
                                                   GEORGE J. LIMBERT
                                                   UNITED STATES MAGISTRATE JUDGE